JOHN W. LERMOND et als., In Equity.

*vs.*

BURNHAM HYLER et als.

Knox. Opinion December 23, 1921.

*A residuary clause in a will which provides one-half of income for life to A, and the other half of income for life to B, and the whole income to the survivor of either for life; and further provides that at the death of the survivor of A and B, one-half of the income to go to C for life, and the other half of the income to go to D for life, and the whole income to the survivor of C and D for life, and further provides that after the death of the survivor of C and D "I give, bequeath and devise all of my property to my then heirs, as provided by law," creates a remainder to take effect at the. close of all the life estates.*

In this case it is held upon both authority and reason that the phrase, "my then heirs" means just what it says when referred to the context of the paragraph in which it stands, and to the other paragraphs of the will.

"After the death" of all the life tenants, the testatrix gives "to her then heirs." "Then" is clearly used as an adjective.

The language of the residuary clause of the will was intended to and did create a remainder to take effect at the close of all the life estates.

On report. A bill in equity to determine the construction of a paragraph in the will of Helen A. Anderson of Thomaston. Upon an agreed statement of facts, and by agreement of the parties, the case was reported to the Law Court for the determination of the rights of the parties. Bill sustained. Decree in accordance with the opinion.

The case is stated fully in the opinion.

*A. S. Littlefield,* for plaintiffs.

*H. L. Withee,* for F. Robinson, Y. Robinson, G. M. Robinson and Marion Dow.

*Chas. T. Smalley,* for all other defendants.

SITTING:  CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

SPEAR, J.  This is a bill for the construction of the following paragraph in the will of Helen A. Anderson of Thomaston:

"I give and bequeath the income of all the rest and residue of my property both real and personal, my bank stock, bonds, and interest in two ships J. H. Thomas and H. D. Rice; one half of the income to go to my sister Priscilla Brown, and one-half to my niece Kate A. Brown during their lives, and if Priscilla Brown dies first the income is all to go to Kate A. Brown; and if Kate A. Brown dies first then the income is all to go to Priscilla Brown; and after the decease of Priscilla Brown and Kate A. Brown, one half of the income of my property is to go to my niece Mary P. Lermond, and one half to my nephew William B. Brown; and if Mary P. Lermond should die before William B. Brown, then all the income of my property is to go to William B. Brown; and if William B. Brown should die before Mary P. Lermond then all the income of my property is to go to Mary P. Lermond; and after the death of Mary P. Lermond and William B. Brown I give, bequeath and devise all of my property to my then heirs, as provided by law."

Priscilla Brown died January 4, 1907; Kate A. Brown died October 17, 1917; William B. Brown died April 20, 1901; and Mary P. Lermond died June 10, 1902.

The question for decision is, who are the persons to take under the residuary clause, which reads as follows:  "And after the death of Mary P. Lermond and William B. Brown, I give, bequeath and devise all of my property to my then heirs, as provided by law." Eliminating still further, the interpretation of the clause may depend upon the meaning of the word, "then" considered in connection with the context and the other paragraphs of the will.  The testatrix provided that the income of her estate should go first to her sister, Priscilla Brown and her niece, Kate A. Brown in equal shares; and upon the death of either, the whole was to go to the survivors.  "After the decease of" Priscilla and Kate A. then the income was to go to her niece, Mary P. Lermond and William B. Brown, in equal shares, and upon the death of either, the whole was again to go to the survivor.  It is perfectly evident from this language that the testatrix did not contemplate the survival of Priscilla or Kate A. over the life

of Mary P. Lermond and William B. Brown. It should be here noted that both of the last group of life tenants died before either one of the first group, so that this contingency upon which the corpus was to vest occurred at one of three different times: First, it may be regarded as a vested remainder and go to those persons who would have been heirs of the testatrix at the date of her decease. Second, it may have gone to those who would have been her heirs had she deceased on June 10, 1902, when William B. Brown the last of the second group died. Third, it may have gone to those who would have been her heirs upon the decease of all the life tenants, in whatever order they died.

The bequest to the second group of life tenants, Mary P. and William B. was based upon the hypothesis of the decease of the first group, before that of the second, as expressed in the clause creating the second group, namely: "After the decease of" Priscilla and Kate A. then the income is to go to Mary P. and William B. and, as a necessary consequence, all provisions relating to the use and disposal of her property after the decease of the first group, and the creation of the second group of life tenants, were based upon the same hypothesis. In other words, when the testatrix came to the provision for the second group, in her vision, the first group had passed away, had ceased to sustain any further relation to her property. Therefore when she came to the residuary clause she contemplated Mary P. and William B. as the last survivors of the life tenants. That is, when, at the time of dictating the residuary clause she looked ahead for a time when it should go into effect, in her mind, she contemplated that either Mary P. or William B. would be the last of all the life tenants to decease.

Whatever may be said with respect to this improvidence of the testatrix with reference to the uncertainty of the second group of life tenants surviving the first, it is nevertheless evident from an analysis of the will that she did not provide for, if she anticipated, such result.

From the above analysis of the residuary clause the paramount question is to determine the intention of the testatrix as to when she intended the corpus of her estate to vest in her heirs.

The language of the residuary clause under interpretation, if given its ordinary meaning is clear and explicit. The clause begins with the conjunction, "and" following a semi-colon, which is used to indicate something in addition to what has gone before. Namely,

"and after the death of Mary P. Lermond and William B. Brown I give bequeath and devise all of my property to my then heirs, as provided by law." There is neither ambiguity nor uncertainty in the import of the above language, when given the usual and ordinary meaning of the words. The remainder, upon the face of the words, would vest upon the death of the survivor of Mary P. and William B., that is in 1902.

But we do not think this construction gives effect to the intention of the testatrix. While she omitted to make any proviso for the decease of Mary P. and William B. before the first group of life tenants, she, nevertheless, provided for such contingency by necessary implication. In her own mind she contemplated Mary P. or William B. as the last of all the life tenants. She, therefore, did not intend that her estate should vest upon the decease of Mary or William, because of the fact of their decease, but because of the contemplated time of their decease, which she unquestionably regarded as fixed at the decease of the last, and consequently, of all the life tenants. That is, the thought paramount in her mind was that the second group would outlive the first group, and that at the decease of the second group, at that point of time, she would vest her estate in her "then heirs" in whatever order they may have deceased. It is claimed, however, that the construction of the residuary clause in question should be so construed as to create a vested instead of a contingent remainder, and that it should be declared the intention of the testatrix that the remainder of her estate, after the death of the life tenants, should go to the persons who were her legal heirs at the time of her decease.

Leaving open the time when the testatrix intended the title to vest in the remaindermen, there can be no question as to when she intended her property to vest in the enjoyment or possession of the life tenants; as it could not so vest at the death of Mary P. or William B. as in that case it would, in fact, as well as theory, have deprived the first group of life tenants of the full benefit of their tenancy. It is therefore evident that her intentions would have been carried out more clearly and precisely as she meant it, if instead of her phraseology "and after the death of Mary P. and William B." she had said "after the death of (all the life tenants), I give, bequeath and devise all of my property to my then heirs, as provided by law."

We come, therefore, in the last analysis, to what the testatrix intended in giving expression to the residuary clause of her will in the phraseology as above construed. The phrase, "after the death of all the life tenants" refers to a specific event the time of which relates to a date subsequent to the death of the testatrix.

"After the death of the life tenants," that is after her own death, in point of time, she gives and bequeaths to her "then heirs."

The question is, shall that phraseology, the meaning of which is obvious and plain, and strikes the reader at once as the correct, if not the only meaning, be interpreted and distorted to sustain a fictitious rule of law, adopted to create the doctrine of vested remainders, by making over wills by construction, or is it to be given its common and ordinary meaning as is required in case of other written instruments.

What reason or justification can be offered for forcing a construction that distorts the meaning and thwarts the intentions of the testatrix?

Were it not for rules of construction invented to give a judicial meaning to the use of certain phrases in disposing of property by will, no person would ever think of giving a construction to the phraseology in the residuary clause of the present will that would make it say that the testatrix meant by the words "then heirs," "now heirs," those persons who would have been her heirs had she died at the time of the decease of the last life tenant.

If every intelligent reader would thus construe the language, it is reasonable to infer that the testatrix understood it in the same way; then why should her property be diverted from the channel in which she intended it to go, by any rule of construction? The very statement so often made, that the law favors vested remainders is an acknowledgment that such a rule contemplates a forced and not a natural interpretation of the language used. There is no reason to be found in the definition or purpose of vested and contingent remainders that should make a contingent less reputable as a property right than a vested remainder.

The vested or contingent character of a remainder to survivors depends upon whether the words of survivorship relate to the death of the testator or to some later period. If the words of survivorship should be referred to the death of the testator the remainder is of course vested, but if it relates to the death of the life tenant or some other person, or to some later event or period, the remainder is con-

tingent. 23 R. C. L., 542, Paragraph 86. Whether the words of survivorship relate to the one period of time or the other is a question that has resulted in no little conflict of opinion. The early English cases for a long period held that words of survivorship should be construed in favor of a vested remainder, unless they expressly or manifestly referred to some other period. After two hundred years, exceptions began to be made, "holding that under the language of particular wills it was the intention of the testators for the words of survivorship to apply to the time of the death of the life tenant or to the time of distribution."

As said in Paragraph 86 supra "Ultimately the exceptions and the dissatisfaction practically changed the rule in England, so that the general rule to be derived from the later English authorities is that the rule which reads a gift to the survivors simply as applying to objects living at the death of the testator is confined to those cases in which there is no other period to which survivorship can be referred and that where such gift is preceded by a life or other prior interest it takes effect in favor of those who survive the period of distribution, or the termination of the precedent estate, and in favor of those only."

After saying that the early English rule has been adopted by some courts in the United States, it is then declared in the same paragraph: "But, as will appear from the various cases involving the questions which follow, the prevailing rule in the United States is that words of survivorship generally relate to the termination of the particular estate. And whether the one or the other of these rules be adopted, it is not a rule of substantive law, but merely a rule of interpretation adopted by the courts as one means of ascertaining the intention of the testator as expressed in the will, and the rule must yield to that intention."

It accordingly appears that the rule in this country and England now is to give the language of the contents of a will that creates remainders an interpretation that will reasonably carry into effect the intention and scheme of the testator.

We find, running through all the cases, that the rule of construction in determining the character of a remainder, must yield to what is often spoken of as the "general intent" of the testator.

It would require a small treatise to analyse the almost numberless cases, that have been reviewed by the courts, and in which the rule and the exception have become so equally divided, that it may be

said in a general way that there are two classes of cases upon this subject, namely, the cases which adhere to the rule, and the cases which are an exception to the rule.

We therefore, find no rule of substantive law that requires any forced construction of the language in the residuary clause of the present will. If that language expresses the general intent of the testator it should be given effect. But we do find a universal and emphatic rule that the general intention of the testator, as gleamed from the four corners of the will should prevail. "When the particular intent cannot be executed, the general intent must direct the construction." *Hawley et al.* v. *Northampton*, 8 Mass., at Page 37, *Hall* v. *Tufts*, 18 Pick., at Page 460, *McArthur* v. *Scott*, 113 U. S. at 378. In our own state it is said: "It is elementary law that the intention of the testator, collected from the whole will and all the papers which constitute the testamentary act, are to govern" *Tibbetts* v. *Curtis*, 116 Maine, 336.

We cannot therefore, limit our interpretation of this will by considering the residuary clause, alone. Under the foregoing rules of construction that the general intent of the testator should prevail, we are bound, as a matter of law, to examine the other parts of the will, to discover if any other provision throws any light upon the specific or general intent. "Does the scheme of the will intend a vested or contingent remainder?" *Hale* v. *Hobson*, 167 Mass., 399.

Proceeding under that rule, if we now resort to an examination of the last paragraph of the will before us, we find revealed in clear outline the general scheme and intent of the testatrix.

"I give and bequeath to my sister Priscilla Brown and my niece Kate A. Brown conjointly, during their lives, and to the survivor during the rest of her life, the use, improvement and income of my homestead in said Thomaston and its appurtenances, with all the books, plates, pictures, furniture and other personal property now therein contained; they to keep the buildings in good repair, and pay all the taxes on the above named property as long as they occupy or receive the income therefrom; and after the decease of my sister Priscilla Brown and my niece Kate A. Brown I give and bequeath the improvement and income of the same to my niece Mary P. Lermond and my nephew William B. Brown, and to the survivor during the rest of his or her life provided they keep the buildings in good repair, and pay all taxes on the above named property, as long as they or

either of them receive the income or occupy my homestead; and after the decease of my niece Mary P. Lermond and my nephew William B. Brown, I give  bequeath  devise the same to my then heirs as herein provided.   In case my niece Kate A. Brown should survive my sister Priscilla Brown, then a home is to be provided for my nephew William B. Brown by my niece Kate A. Brown during the residue of her life and occupancy of the homestead, provided he needs one and shall live with her in said homestead and nowhere else."

Having made two bequests to the amount of twelve hundred dollars, she then in the residuary paragraph disposes of the income of all the rest and residue of  the property real and personal as well as the residuum, as already appears.

Having done this she then proceeds to the next and last paragraph in which she disposes of the real and personal estates, themselves, as life estates, and prescribes the manner of their use, care, and manumission by the life tenants to their successors and remaindermen.

In her scheme, the first life tenants turn over the property to the second life tenants, in good repair, taxes paid, and with improvements. The second life tenants turn over the property to the remaindermen in good repair, taxes paid, and with improvements, if any.   To condense still further:   She gives first, the property to the first group of life tenants.   She gives, second, the *same* to the second group of life tenants.   She gives, third, the *same* to her "then heirs."   The *same* as used in the last paragraph means the real and personal property, with improvements, kept in good repair and taxes paid, as that property stood at the decease of the last life tenant.

In contemplation of the future her scheme had brought her down to the last group and through the life of the last group to the final disposal of the estate, itself, her immediate friends having been provided for.

And she then gives the estate, not necessarily as it was at the time of her decease, but as it was at the decease of the last life tenant, "the same" that had been enjoyed by the first group of life tenants; the *same* that had been enjoyed by the second group of life tenants, with improvements; the *same* which passed from their enjoyment to her "then heirs."

A fair construction of  the last  paragraph clearly confirms  the obvious meaning of the residuary clause of the third paragraph.   It carries forward the residuum of her estate to the last survivor of the

life tenants and gives "the same," that is her estate as it was at that time, to her "then heirs," as provided by law.

If she had intended to vest her estate in the remaindermen at the date of her own decease, then the language of the last paragraph is contradictory of the language of the first, and describes what might be a different property. Just what the property might be with possible improvements at the time of the decease of the last tenants, could not be ascertainable until that time. The last paragraph, therefore, brings the case in close analogy to *Hale* v. *Hobson*, 167 Mass., Page 399 in which it is said as one of the reasons for declaring a contingent remainder. "The fact that the residue is unascertainable until the time of distribution arrives tends to show an intention to postpone possession and also the acquisition of an absolute interest."

Moreover, she evidently intended that the life estates should take care of the life tenants, as she gave them, during their lives the entire use, income and enjoyment. But in addition to this, if she intended a vested remainder, all the life tenants took in fee, as well as for life, at her decease, and their heirs would become residuary legatees, at the time of distribution, as well as the other heirs of the testatrix existing at the time of her decease.

The residuary paragraph and the last paragraph when read together make clear the intent of the testatrix in the words of the phrase "then heirs."

The only precedent for the exact phraseology employed in the present will, "then heirs" is found in *Proctor* v. *Clark*, 154 Mass., 45 in the following language: "Upon the decease of my said wife, then to pay and convey in fee all the trust property, as it then exists, to my said brother, Charles Henry Hancock, if then living, but if he is not then living, then to convey the same in fee to his then heirs at law, whereupon this trust shall end."

The language in that case is "to his then heirs at law," in the present, "to my then heirs, as provided by law."

The Proctor case not only construes the meaning of the phrase "then heirs" but notes the rule and the exception, as follows:

"The words mean those who would have been entitled if Charles Hancock had died at the moment appointed for the conveyance, that is, at the death of the testator's widow on Jan. 6, 1890. The gift is to Charles Hancock's "then heirs." The word 'then' takes the case out of the general rule illustrated by *Dove* v. *Torr*, 128 Mass., 38,

*Abbott* v. *Bradstreet*, 3 Allen, 587, and *Whall* v. *Converse*, 146 Mass., 345, and brings it within the exception established by *Knowlton* v. *Sanderson*, 141 Mass., 323, *Fargo* v. *Miller*, 150 Mass., 225 and *Wood* v. *Bullard*, 151 Mass., 324  For, qualifying heirs as it does, it can only mean heirs ascertained as of that time.

The Proctor case is the only parallel case that has yet been found by the able attorneys who represented the different interests in the estate, or by the court in its research of the law.

We find many analogous cases, but as each case stands upon its own particular facts, as the present case does, they would be of but little if any aid in pointing to a correct conclusion.

It is therefore the opinion of the court upon both authority and reason that the phrase in the present case, "my then heirs" means just what it says when referred to the context of the paragraph in which they stand, and to the other paragraphs of the will.  "After the death" of all the life tenants, she gives "to her then heirs." "Then" is clearly used as an adjective.  According to Webster's New International Dictionary, "then," used as an adjective is defined: Existing, acting at, or belonging to the time mentioned; "as the then current of opinion."  The time mentioned in the will was "after the death" of the last life tenant.

We are of the opinion that the language of the residuary clause of the will of Helen Anderson was intended to and did create a remainder to take effect at the close of all the life estates, to wit:   October 17, 1917.

> *Bill sustained.*
> *Decree in accordance with*
> *this opinion.*